# Newman and Beck *v.* Jesse Meek *et al.*

A parol agreement cannot be admitted for the purpose of contradicting or altering the terms of a written agreement.

A gratuitous agreement for indulgence in the payment of money may be disregarded without violating any legal or equitable obligation, or subjecting the party so disregarding it to any legal liability or restraint.

The rule that a sale will be set aside for inadequacy of price, applies only to private contracts between vendor and purchaser ; it does not extend to sales by auction, unless connected with some other circumstances going to establish fraud.

Mere inadequacy of price is not sufficient to set aside a contract, unless it is so gross as to furnish evidence of fraud. There must be an inequality so strong, gross, and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it.

If a purchaser at an auction sale, by fraudulent management or misrepresentation, prevent the attendance of others, or use any influence to put down fair competition in bidding, a court of equity would interpose and set aside such sale on the ground of fraud.

The fact that a trustee made a sale of property at a time when money was scarce, and there were but twelve to twenty persons present at the sale, is no evidence of fraud or unfairness in the sale.

The bill states that on the 8th day of January, 1835, complainant Newman purchased of Joseph Meek, since deceased, a tract of land containing about five hundred and sixty acres, for sixteen thousand eight hundred dollars, and took a general warranty deed from Meek; that on the 9th of January, 1835, complainant Newman purchased of Meek forty negro slaves, for thirty eight thousand dollars, and took bill of sale for them from Meek, which contains their names and ages ; that complainant Newman was to pay for the land and negroes in three instalments, one of $17,666 on the 1st of March, 1836; one of $17,667 on the 1st March, 1837; and the third of $17,667 on the 1st of March, 1838, for which complainant Newman executed three promissory notes, payable as above, to secure the payment of which he executed a mortgage of the land and negroes to Meek; that on the 30th of May, 1836, complainant Newman sold to complainant Beck and Warner M. Yates, the land he had bought of Meek, with some more land, in

all making about twelve hundred and eighty acres, and gave a general warranty deed for the same ;· and that complainant Newman at the same time sold to complainant Beck and said Yates all or nearly all the negroes he had purchased of Meek, with some others, making about forty four ; and that complainant Beck and said Yates were to pay complainant Newman for the land and negroes $97,000, for which they executed four promissory notes, one for $25,000, payable 1st of January, 1838; one for $24,000, payable 1st of January 1839 ; one for $24,000, payable 1st of January, 1840, and one for $24,000, payable 1st of January, 1841, to secure which notes complainant Beck and said Yates executed a mortgage to complainant Newman upon the land and negroes sold by him to them; that on the 20th of December, 1836, complainant Beck transferred to said Yates all the interest he had in the land and negroes by them purchased of complainant Newman, for a full consideration, which appears by a reference to the bill of sale; that on the 20th of December, 1836, aforesaid, said Yates executed a deed of trust to John Montgomery, of Madison county, which was signed, sealed and delivered to said Montgomery by said Yates, complainant Newman and said Meek ; that the said deed after stating the facts in relation to the different sales, and declaring the original mortgage made by complainant Newman to Meek, and the deed of trust to complainant Newman made by said Yates and complainant Beck to be void, contained a relinquishment to said Yates of the legal title which said Meek had to the property sold by him to complainant Newman, and by him sold to said Yates ; it also contained a release of all the interest which complainant Newman had in the property sold by him to said Yates, and to secure the payment of seven thousand nine hundred and sixty dollars, due 1st of March, 1837, and a debt of twenty thousand six hundred and ninety-seven dollars, due 1st of March, 1838, due from complainant Newman to said Meek, the same being the balance of the original sum which complainant Newman was to pay said Meek for the property; and to secure certain debts said Yates owed complainant Newman for the property, the said Yates sold and transferred his interest to said Montgomery—the tract of land of twelve hundred and eighty acres, and the forty-two negroes; that the said deed contained a power of

sale, authorizing said Montgomery or his executors, in the event that said Yates should fail to pay either of the said notes as they fell due, upon the request of said Meek or complainant Newman, to whom the said notes might be payable, after the expiration of sixty days from the failure of said Yates to pay the same, to sell the property or as much of it as would be sufficient to pay said note so due and unpaid, he the said Montgomery giving fifteen days notice of the time and place of sale, and in the notice describing said property with sufficient certainty; that after making said deed to said Montgomery, said Yates, on the 7th of April, 1838, sold complainants the tract of land of about twelve hundred and eighty acres, and eighty acres more, making about thirteeen hundred and sixty, for $40,800; that at the same time, for the sum of $40,000 paid to said Yates by complainant, he sold to them the negroes mentioned in the deed to said Montgomery, and gave them a bill of sale for them, by means of which purchase the deed to Montgomery, as far as complainant Newman had any interest in it, became inoperative and void, and the debts which said Yates owed complainant Newman were cancelled; that complainant Newman, in consideration of the purchase, and as a means of paying his share of the purchase money to said Yates, discharged and released him from the payment of the same. By means of which purchases complainants became jointly interested in the plantation and negroes aforesaid, and received them incumbered with the deed of trust to Montgomery, in favor of said Meek.

That some time in 1837 the said Meek died intestate, in the state of Tennessee; that no person has as yet, as complainants believe, taken out letters of administration in this state on his estate; that one Jesse Meek, a citizen of Tennessee, pretends as complainants have heard to have obtained letters of administration on said estate in the state of Tennessee; that complainants cannot tell whether this is so or not; and that of the original purchase money agreed to be paid by complainant Newman to said Meek, for the land and negroes, thirty four thousand seven hundred and thirty dollars or thereabouts had been paid previous to the commission of the grievances to be alleged hereafter, leaving the sum of $18,000, or thereabouts due and unpaid, which with the interest upon the same would have amounted to something like 22 or $23,000;

that some time in the fall of 1838, the said Jesse Meek came to complainants and represented himself to be the executor or administrator of the said Joseph, deceased, and stating to complainants that he wished to obtain a portion of the money due the estate of said Joseph for the purchase of land and negroes aforesaid, and thereupon in consideration that the complainants would deliver him the crop of cotton then growing upon the plantation aforesaid, which crop was worth about 6,000 dollars, he agreed and promised complainants to wait for the remainder of the money until they could conveniently pay the same; that he would not attempt to enforce or have enforced the deed of trust made to the said Montgomery upon the land and negroes, and that he would take the annual crops made upon the place in discharge of the same; that believing the said Jesse to be the rightful administrator of the said Joseph, and capable of making this contract, they delivered him the crop of cotton then growing upon the land according to their agreement; and placing full confidence in the honesty of said Jesse, they made no other effort to raise the remainder money due the estate of said Joseph at that time; that believing they need have no apprehensions that the deed of trust would be enforced against them, complainant William C. went home to Marshall, and ceased to make any other exertion to raise money to discharge said incumbrance; that the faith which they placed in said Jesse had been abused; that in violation of his agreement with complainants he had combined with the said Montgomery and others unknown to complainants, to defraud complainants, and procured said Montgomery on the 4th of March, 1839, to sell under the deed of trust, the land and negroes mentioned in it; that this sale was made in fraud and in violation of the agreement between said Meek and complainants, and to enable said Meek to purchase in the property at a price far less than it was worth; that Meek and Montgomery well knew money was so scarce at that time that no bidder would be present who could buy and pay cash for so large an amount of property; that they well knew the complainants could not in the short space of time between the notice and day of sale raise the money to pay off the incumbrance or claim of the estate of Meek upon the property, particularly as they did not expect a sale to take place, until they saw it advertised; that the notice of the sale

was the shortest which the terms of the deed allowed; that the notice of the sale did not describe the property as the deed of trust enjoined, and appointed the sale to take place on the premises; that the same paper which contained the notice of sale by Montgomery, contained a notice of the marshal that by virtue of certain executions against complainant Beck and his sureties, he would sell on the 4th day of March, 1839, in the town of Canton, all the interest which complainant Beck had in the negroes aforesaid; which notice the said Montgomery knew was published in the same paper with his own; that under all these circumstances the said Montgomery did proceed and sell the land and negroes mentioned in the deed, on the premises, on the day appointed by him; that the distance was seven miles from Canton, the place where the marshal had advertised to sell the same negroes; that there were not more than six or eight persons present; that complainants insisted that Montgomery should postpone the sale until some more favorable opportunity when complainants' property might be sold, and not *sacrificed*, as complainants told him would be done; that Montgomery refused to postpone the sale, but took a bond of indemnity from said Meek and proceeded to sell; that no one bid for it, but the said Meek; that the same was sold to him at a price not equal to one-fourth its real value, the amount bid by him not being equal to the amount due the estate of said Joseph Meek, when the property was worth seventy-five thousand or one hundred thousand dollars; that if they had known that Meek would not have complied with his agreement, they could have raised the money to pay off the incumbrance upon the estate. The bill prays for a rescission of the contract, an account, &c.

The separate answer of Jesse Meek admits the purchase of the land and negroes by complainant Newman from Joseph Meek, and the execution of the notes and mortgage by Newman to secure the payment, and the sale of the said land with the addition stated, and the slaves, to said Beck and Yeats as stated, and the sale by Beck to Yeats, and the execution of the deed of trust by Yeats on the 20th December, 1836, to defendant Montgomery, and the repurchase by the complainants from Yeats; admits the death of Joseph Meek, but denies that he died in Tennessee; says he died in Madison county, Miss., and says he obtained letters of administra-

tion of Joseph Meeks' estate from the probate court of Madison county, the place in which said Joseph died, and where the property was situated; that he also obtained letters of administration in Davidson county, Tennessee, the place where said Joseph resided at the time of his death; that he is unable to say how much of the purchase money had been paid to said Joseph in his lifetime; that no portion of it had been paid to defendant, except two thousand dollars and some cotton; that he believes the amount due to said Joseph is correctly stated in the deed of trust to Montgomery by Yeats; that some time in the spring of 1838 he was desirous of obtaining the money due his intestate from Yeats, and commenced suit against Yeats for it.

Soon after the commencement of these suits, Yeats agreed with defendant, in consideration that he would indulge him to December, 1838, to pay two thousand dollars immediately, which he did, three thousand dollars at the May circuit court for Madison county, and to dismiss a bill of injunction at his own cost, which he had obtained against Joseph Meek to stay the collection of this money; that, before the arrival of the May circuit court, Yeats made the sale to complainants; was unable to pay the three thousand dollars; that the complainants being then the purchasers from Yeats, that complainant Newman entered into an agreement in writing, which is not in his possession, by which he agreed, according to the recollection of defendant, to draw a bill for thirty-five hundred dollars, which was done by him and Uriah Newman, on the house of Maunsel White & Co. in favor of James Priestly, and by him indorsed to defendant; that he agreed to let defendant have the cotton crop made that year (1838) upon said tract of land, called the Yeats tract, and also the cotton crop which should be made on two other plantations, one in Hinds and the other in Carroll county, in connexion with Uriah Newman; that defendant agreed to wait for the balance till January, 1839; that he received from the Yeats plantation and the agency plantation (in Hinds county) about one hundred and forty bales of cotton, being much less than the entire crop; that complainant failed to give him any part of the crop from the Carroll county plantation; that he has not yet received an account of sales of said cotton, and cannot say what credits complainants will be entitled to on that account; and

denies that he agreed to wait for the remainder till complainants could conveniently pay the same; and denies that he agreed not to have the deed to Montgomery enforced; denies having agreed to take the annual crops made upon the place in discharge of the debt; and denies having done or promised any thing to justify complainants for their want of exertions to pay the debt; and says that the estate of Jesse Meek was much embarrassed, and that he needed the money as administrator, and was so anxious to procure payment from complainants that he admits he told them if they would raise him ten thousand dollars he would indulge them another year, but that they made no offer to raise him any money at all. Defendant further states, that, for some time before the sale under the deed, he was afraid complainants were unable to raise him any money, or were unwilling to do so, and that he had told said defendant Montgomery that he was afraid he would have to sell; that Montgomery, having occasion to go to New Orleans, and thinking he might have to proceed under said deed before his return, had authorized defendant Meek to use his name in advertising the property for sale; that it was well known that judgments were obtained against complainant Beck; that he expected both the sheriff and marshal would proceed to sell his interest in said land upon executions; that this was frequently a subject of conversation between defendant Meek and complainant Newman; that Newman expressed it as his opinion, if not his wish, that he should proceed under the deed to make his money, and denies that defendants Meek and Montgomery combined to fix the sale at the shortest notice; and states that, having to go to Carroll county, he authorized complainant to advertise the property for sale, and that he believes said Newman had it made in his absence and during the absence of Montgomery in New Orleans; and that, as soon as defendants returned home, they adopted the act as their own, but neither of defendants had any agency in fixing the time of sale; that neither of them knew of the coincidence of that advertisement and the marshal's advertisement appearing in the same paper, or of both sales being fixed for the same day, until it was done by the agency of Newman, and that notices of the sale were put up in several public places, and that defendant Meek was industrious in giving personal notice to several persons,

and requesting their attendance, and that, though the township and range in which said land was situated was omitted in the advertisement, yet the reference to the deed of trust, with its date and place of registration, notified the public, with sufficient certainty, where the sale would take place; that complainant Newman was at the sale with a diagram, and showing the subdivisions as they were under sale and crying.

Defendant admits that complainants expressed a wish to have the sale postponed, but that he saw no chance of complainants getting in a better situation by further indulgence, that complainants had deceived him in not giving him the quantity of cotton they promised, and offered no assurances of money at a short time, nor at any time, as an inducement for further delay.

Defendant denies that there were only a few people at the sale, but says there were from twelve to twenty respectable farmers, able to purchase and good judges of property; that Yeats had sold nine of the negroes and carried one off; that Newman had sold some, and he believes it was his intention to defeat the collection of the debt entirely, as, since the sale, several of the negroes have been induced to run off.

Defendant further says, that he believes he bid as much for the property as it would have sold for under any circumstances for cash; and further, that he had not given said trustee, Montgomery, any indemnity before the sale, but that he has since the sale; and that, under all these circumstances, he proceeded to sell, as he believed it his duty to do as administrator; and further, denies all fraud and combinations, and denies all things neither admitted nor denied, and prays to be dismissed with his reasonable costs, &c.

The separate answer of John Montgomery states that he knows nothing of the different sales and transfers of said land and negroes made previous to his connection with them; admits that he was trustee, as charged in complainant's bill; that he sold the land and negroes mentioned in said deed on the fourth March, 1839 ; that Jesse Meek became the purchaser at said sale; that the time was the shortest limited by the deed for the sale, but denies that it was by his wish, but that he was absent from home when made; that complainant Newman had it made according to his own

wish and understanding of the interest of all concerned; that when he came home, he approved it, and proceeded to sell, by the wish of defendant Meek; and admits that the township and range of the land was omitted, but that it was not his fault but the fault of the complainant, and states that the omission made no difference, as the place was so well known, and that the description fully notified the public of said sale; admits that complainant Newman wished a postponement of the sale, but not for any particular time; denies taking any indemnity until after the sale admits that Meek requested him to advertise before he left home, but being in a hurry to leave, did not do so, but authorized Meek to do it in his absence.

Defendant states that there were fifteen or twenty persons at the sale, and that the property sold for more than its real value in their condition. Defendant further states that the statements made by defendant Meek, in his separate answer, are substantially correct, and further denies all fraud, and says that is wholly and utterly false, and that he only done what he conceived to be his duty, and prays to be dismissed with his reasonable costs.

Job G. Selph, a witness for the plaintiff, proved that there was an agreement between defendant Meek and complainant Beck, made about the 1st of March, 1838, in which Meek, as executor of the estate of Joseph Meek, agreed that if Newman & Beck would give up their entire crop of cotton to him, that he would let them keep possession of the plantation and negroes, on which Meek had a claim by virtue of a deed of trust, in which John Montgomery was trustee; and that he would allow them to work out said claim by continuing to give him their crop from year to year, till the claim was satisfied; that he heard Meek say that Newman & Beck were complying with their contract, and that he had no doubt they would make all right; and that it was a matter of general notoriety that Newman & Beck did deliver the crop of cotton to said Meek; that he knew nothing of the sale of the property by Montgomery, except he heard Meek say he had bought it at the trust sale made by Montgomery, and that Meek had told him a short time prior to the sale that the property was worth upwards of fifty thousand dollars in cash; that the property was known as the Newman Plantation on the Panther creek; that there was

between thirty and forty negroes; that said plantation adjoined the plantations of John Montgomery, Thomas Henderson, and Mrs. Hilliards, in Madison county, and contained about twelve hundred and eighty acres, about six hundred acres in cultivation in 1838.

George W. Terrill, a witness for the plaintiff, proved that there was an agreement between Meek and Newman & Beck, in which Meek agreed to take the crop of cotton then growing, and make no further demand till the next crop made upon the said plantation; that Meek agreed to take the annual crop of cotton made upon the plantation in payment of the claim he had upon it, as administrator of Joseph Meek, till the whole debt was discharged; that in pursuance of this agreement Newman & Beck did deliver during 1838 and 1839 the whole crop of cotton made upon the place, amounting to about one hundred and twenty bales; that he heard Meek say he had not only received this crop, but also the greater portion of the cotton grown the same year (1838) upon the individual plantation of Newman in Hinds county, amounting to about one hundred bales; that this cotton by agreement was to be credited on the debt of Newman & Beck to Meek; that Meek afterwards told him he intended to place it on another debt which he had against Newman; that he knows nothing of the sale of the property by Montgomery as trustee, except he heard Meek say it was the same property conveyed by Yeats to Montgomery as trustee, and the same purchased by Newman and Beck from Yeats; that he heard Meek say that Montgomery, the trustee, was absent when the property was advertised, but was present at the sale, and that he, Meek, had purchased nearly all the property sold under the said deed of trust.

Robert M. Latimore, a witness for the plaintiff, proved that he went at the request of Charles C. Shackelford to the probate clerk's office of Madison county, and procured a description of the real and personal property named in a deed of trust made by Warner M. Yeats to John Montgomery, as trustee, for the use of Joseph Meek; that it was the same as advertised for sale under said deed, except that a slave named Betty is called Billy in the deed; that the township and range is not inserted in the advertisement; that the advertisement was published in the Madison Whig Advocate,

a public newspaper, published in Canton; that he thinks the township and range left out in the advertisement in the paper, were inserted in the hand bills; that a correction was afterwards made as to the description of the land; that from what he could learn Newman was opposed to the sale, and expressed a determination to stop it if he could, by an injunction; that some of the hand bills containing the advertisements were stuck up in Canton; that Beck was considered insolvent for some time before the sale; that he did not know any thing of the embarrassments of Newman, if he had any; that the correction in the advertisement about the land was made in the next paper after the first publication; that the injunction spoken of by Newman was to stop the sale of the said property on the 4th of March.

Charles C. Shackelford proved that he was one of the editors of the paper in which the advertisement was made; that Jesse Meek employed him to prepare the advertisement, and to have the notice given both in the Madison Whig Advocate and in hand bill form, and authorized him to use the name of John Montgomery, who was absent, that Newman knew all the proceedings that were done by him, as far as related to preparing the advertisement; that he did not recollect whether Newman was with Meek at the time the application to make the notice was made to him; that sometimes Newman appeared willing that the sale should be made; that he believed he heard Newman say he would rather the property should be sold to pay the debt for which it was bound, than for the individual debts of Beck; that Beck was much embarrassed at the time the sale was made; that Beck's interest in the property was about to be levied on, which induced him to shorten the time of notice; that if he did not shorten the time, he thought the rights of *cestui que trust* would be jeopardised.

Harry Christmas, a witness for complainants, proved that he was present at the sale; that Meek ordered the sale; that Meek was the only bidder at the sale, except one William B. Perkins, who bid for one boy; that Meek purchased all the property, land and negroes; that there were six or seven persons at the sale; that several of them were about leaving before the sale commenced, but staid at Meek's request till it was over; that the negroes sold for as much as he thought they were worth, but the land did not;

that the negroes were in bad condition and badly clothed; that their condition was such as to endanger their health; that Meek gave more for some of the negroes than they were worth; that Meek requested them to purchase the property two or three times, saying he would rather have the money; that Newman pointed out the particular tracts or parcels of land as they were sold.

Abraham Davis, a witness for the complainants, proved that he was present at the sale; that Newman forbid the sale, because there had been an injunction obtained, which he thought would hold good; that Meek asked him to bring the property up for sale; that Mr. Cayce proceeded to sell; that Meek was the only bidder, except Mr. William P. Perkins, who bid for two of the negroes; that the negroes sold for as much as they were worth; that the negroes were all sound, with one or two exceptions; that they were badly clothed; that the land was sold to the best advantage, but did not sell for as much as it was worth; that Meek and Newman were out to examine the property; that Newman insisted that the property should be sold to pay the debt due Joseph Meek, mentioned in the deed of trust; that he did not want it sold to pay Beck's debt; that Newman proposed to Meek that he should buy the property, and that he would put in his hands lands in Carroll county, and they would go in partnership; that Newman's reason for wishing the property sold was, that Beck's interest was levied on by the marshal and sheriff; that Newman said he expected Meek would purchase the property; that he thought the sale would take place because Beck would not be able to do anything; that George W. Terrill had taken off six of the negroes from the place, under a purchase from Yeates; that none of these were present at the sale but one, a man named Alfred, who was sold; and Andy and Grace were sold as they run; that they afterwards came back, but run off again; that none of the other negroes taken by Terrill have been obtained, except a woman and child who are on the plantation; that the negroes named in exhibit C. were the negroes Newman proposed to put in partnership with Meek; that he believes the writing to be Newman's.

Charles Moore, a witness for defendants, proved that he saw an advertisement in Madisonville, in the post-office, and at some other place, but does not know how long the notice was up, but saw it the

3d Saturday in February; that he did not know on what day the sale took place.

Girard Stites, a witness for complainant, proved that an advertisement signed by John Montgomery, trustee, was posted 10 days previous to the day of sale.

George E. W. Nelson proved that he was publisher of the Madison Whig Advocate, published in Canton; that the advertisement marked A. in the deposition of Mr. Latimore was published in said paper about the 16th day of February, 1839; that the alteration shown in the advertisement marked B. was inserted in the next paper, about the 23d of February, that 25 hand bills were printed in the said office, containing the said advertisements.

Thomas Sanders, a witness for defendants, proved that he saw the advertisement spoken of in Madisonville, but does not know how long previous to the day of sale; that he does not know of any lands selling for more in cash than the land in dispute.

Daniel P. Perkins, a witness for complainants, proved that he was at the sale mentioned in complainant's bill; that Newman forbid the sale; that it was generally understood that Meek would purchase the property; that there were not more than 15 or 20 persons at the sale; that some of the negroes brought their full value; that some did not; that the land sold for less than it was worth, and that no one bid for it but Meek; that if the sale had been postponed the property would have brought a better price; that Meek requested persons present to bid for the property, saying he only wanted the money.

William P. Perkins, a witness for complainants, proved that he was present at the sale mentioned in complainants' bill; that Meek purchased the property, no one bidding for the land but him, and no one for the negroes except Meek and himself; that Meek had it in his power to purchase the property, as he did not think any of the persons present had the money to purchase it; that the land sold for less than land was generally selling for at that time; that he saw the property advertised in Livingston.

Matthew C. Cayce, a witness for complainants, proved that Meek and Montgomery called on him to sell some property, land and negroes; when he arrived at the place, (the place now in dispute,) he found but few people there; that Josiah Newman forbid the

sale, but Meek instructed him to proceed; that Meek purchased the land at five dollars per acre; that no one else bid for it; that Meek purchased all the negroes; that he thought the land as good as any in the neighborhood, and worth fifteen dollars per acre in cash; that the negroes were not a very good lot; and that he thought the persons present were able to purchase if they chose.

John F. Cook, a witness for the complainants, proved that he levied·on Beck's interest in the land and negroes mentioned in complainants' bill, but did not sell any of the property, it being subject to trust deeds and older executions; that he sold two plantations about that time, one brought nine dollars, the other five dollars, that it was about such land as the property in dispute; that he had several executions against Beck, and considered him insolvent; that he considered Newman perfectly solvent; that good negro men were selling for about eight hundred dollars or a thousand, and women from six to eight hundred.

Samuel M. Flournoy, a witness for defendants, proved that on the 4th of March, 1839, he was sheriff of Madison county, and about that time sold lands from seventy-five cents to four dollars an acre; that the land he sold was not of the first quality, and was not within eight or ten miles of Canton; that he had one or two executions against Newman at that time, but did not press them, because he thought he was a man of his word, and therefore indulged him.

WILLIAM YERGER, for complainants.

First. A sale made by a trustee under circumstances of great improvidence, and with a view to advance the interest of a particular creditor, will not be enforced, though there was no imputation upon the conduct of the purchaser. Ord *v.* Noel, 5 Madd. R. 438; Willis on Trustees, 134; 10 vol. Law Lib.

Second. A sale by a trustee, though clothed with all the forms required by the deed, will be set aside, if the price paid be greatly disproportioned to the real value. Wright *v.* Wilson and others, 2 Yerg. Rep. 294; 4 Dall. Rep. 221.

Third. A sheriff who sells property, at a price greatly disproportioned to its real value, is liable to an action, although the goods

were sold at auction. Keightly *v.* Birch, 3 Camp. Rep. 520; Watson on Sheriffs, 136—163.

Fourth. An enormous inadequacy of price, is a circumstance from which unfairness may be inferred, and in connection with other circumstances, may authorize the chancellor to vacate the sale. Gist *v.* Frazer, 2 Litt. Rep. 118.

Fifth. The trustee is bound to manage the trust property, with the same care and diligence of a provident owner. Fletcher on Estates, 59, 126; Hovenden on Frauds, 486; *Ex Parte* Bennett, 10 Ves. Rep. 385; Dorone *v.* Gragebrook, 3 Mer. Rep. 208.

HUBBARD and HUGHES, for defendants.

The grounds upon which it is sought to set aside the sale mentioned in the bill by the brief of the complainant, are—

First. Because there was great improvidence by the trustee, and the sale was made with a view to advance the interest of a particular creditor.

We presume this is the first ground, because an authority is cited to that effect. There are no such circumstances attending the case; no evidence of improvidence. The sale was made for the payment of the debt in the deed of trust mentioned, which, it is true, was a particular creditor. On this authority the sale cannot be set aside.

Second. It should be set aside, because the price given was greatly disproportioned to the real value of the property.

We admit the principle of the authorities referred to, to sustain this position; but that principle does not apply, because the fact is not proven that the price given was greatly disproportioned to the value. The proof of all the witnesses is, that the negroes were, some of them, sold for more than they were worth, and all for something like their value. As to the land, some of the witnesses say it was not sold for its value; although by some witnesses it is testified, that other lands, about the same time, were sold at sheriffs' sales for much less than the price given for this land. Taking the whole sale together, it is most manifest, that as much or more money was bid for the property than would again be bid, or than at the time the same would have sold for, if Meek himself had not attended the sale and bid himself. The amount bid for

the property was about nineteen thousand dollars, more than the property is now worth. If there had been an *enormous inadequacy of price*, we admit that this would have been a circumstance from which unfairness might have been inferred. This was not, however, true; but on the contrary, it is certain, that the negroes sold for their full value, and the land though less than the *ideal* value fixed upon it by the witnesses, yet not for so much less than its true value as to shock the senses of a right-minded man.

These are all the grounds which appear to be taken by the counsel for complainants in their brief. We have therefore nothing further to say.

The CHANCELLOR,

Although the facts in this case are somewhat voluminous, very few of them seem to have any direct connection with its merits. The complainants became the purchasers from one Warner M. Yeats, of a plantation and a number' of slaves, situated in the county of Madison. Prior to their purchase, the same land and slaves had been conveyed in trust to the defendant, Montgomery, for the purpose, in part, of securing the payment of a large sum of money, owing by said Yeats to Joseph Meek. The deed of trust contains a provision that the trustee should, when Yeats made default in the payment of the money, advertise and sell all or so much of the property as might be necessary to meet such default. The complainants show that they had full notice of the deed of trust, and I infer, although it is not expressly so stated, that they purchased from Yeats with the understanding and agreement that they were to discharge the debt due from him to Meek under the deed of trust.

It is charged that Joseph Meek is dead, and that the complainants entered into an agreement with his administrator, Jesse Meek, by which it was stipulated that the payments under the deed of trust should be delayed until the debt could be discharged by the annual crops of cotton to be made on said plantation. It is also charged that said administrator, in violation of this agreement, procured the trustee to advertise and sell under said deed of trust, at a time of great pecuniary pressure; that this step was the result

of a fraudulent combination between the trustee and said Meek, for the purpose of enabling Meek to become the purchaser of the property at a sacrifice; that, at the sale of the property, there were but few persons present, and that Meek became the purchaser of the whole of it; at about one-fourth of its value. Upon these grounds a rescission of the sale is asked for.

The questions to be examined are: 1. What is the effect of the alleged agreement for delay on the payments due under the deed of trust? 2. Does the testimony establish any fraud or oppression on the part of Meek and Montgomery, with reference to the sale? 3. Was the price at which the property sold so grossly inadequate as to vitiate the sale?

1. The agreement for delay, which the complainants have attempted to establish by evidence, is liable to the objection that it rests entirely in parol, and cannot be admitted, therefore, for the purpose of contradicting or altering the terms of the written agreement as embodied in the deed of trust. But a more insurmountable objection to such agreement is, that it appears to be wholly without consideration, and was therefore a mere gratuitous agreement for indulgence, which Meek was at any time at liberty to disregard, without violating any legal or equitable obligation, or subjecting himself to any legal liability or restraint. It is useless to refer to authorities to establish these plain and familiar principles of law.

2. The second ground urged for the complainants is, that the sale was brought about under such circumstances as render it fraudulent in the eyes of a court of equity. I can have no doubt, upon general principles applicable to all contracts, that if a purchaser at such sale, by fraudulent management or misrepresentation, prevented the attendance of others, or used any influence to put down fair competition in bidding, a court of equity would interpose and set aside such sale on the ground of fraud. But I have looked closely to the testimony in this case, and find nothing to cast the slightest suspicion upon the conduct of either the trustee or the purchaser.

I can see nothing in the time, manner or place of sale, inconsistent with the requirements of the deed, or incompatible with the strictest notions of fairness and honesty. The testimony

Newman and Beck *v.* Jesse Meek *et al.*

shows that there were present from twelve to twenty persons; that Meek had been active in giving extensive circulation to the notice of sale, by having it inserted in the Gazette, published in the neighborhood, and posted in public places in printed handbills, and that on the day of sale he was urgent in endeavoring to get others to bid, saying he wanted the money due him, not the property. I see nothing in the allegations of the bill that money was scarce, and that the complainants urged a postponement of the sale, to warrant the imputation of fraud. The defendant's money had then been due for more than a year, and I can see no obligation on his part to await a more favorable condition of the money market.

3. The last ground taken for the complainants is, that the sale should be set aside for gross inadequacy of price. The application of the rule, with reference to inadequacy of price, has been generally made to private contracts between vendor and purchaser, and has been held not to extend to sales by auction, unless connected with some other circumstances going to establish fraud. Shelly *v.* Nash, 3 Madd. Rep. 232; White *v.* Damon, 7 Vesey, 30; Jenkins *v.* Hogg, 2 Cons. Rep. S. C. One of the reasons given why the rule is not applicable in sales at auction, is, that there can be no treaty between vendor and purchaser, and therefore no opportunity is afforded for fraud or imposition on the part of the purchaser.

Another and more satisfactory reason is, that sales of that description, where they are openly and fairly conducted, furnish the best evidence of the market price of the thing sold. But even if the rule applied to sales at auction, there is nothing in the facts of this case which calls for its application. All the witnesses concur in saying that the slaves sold for their value, but that the land did not, having brought only five dollars per acre. One of the witnesses says the land was worth fifteen dollars per acre, whilst the others do not attempt to fix its value.

It is to be observed in this case, that the terms of the deed of trust call for a sale at auction for cash; if, therefore, it brought the usual market price at such sales, it is not liable to the objection of inadequacy, although it may fall short of the sum at which it might have been estimated in a private sale between vendor and

purchaser. The deputy marshal proves that he sold land in the same county about the same time, and of equal value at the sum of five dollars per acre, and the sheriff of the county testifies that he sold land under like circumstances at from two to four dollars per acre. I can see nothing, therefore, in the testimony showing that the land did not bring its market value, much less to warrant me in setting aside the sale upon the ground of inadequacy of price. The inquiry in this case is not whether the property brought its market value; but the question is, whether the deficiency is so great as to amount to evidence of fraud and unfairness in the sale.

Mere inadequacy of price is not sufficient to set aside a contract, unless it is so gross as to furnish evidence of fraud, in the language of Lord Thurlow in the case of Gwynne *v.* Heaton, 1 Bro. Ch. Rep. 9, "there must be an inequality so strong, gross and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it." The cases of Butler *v.* Haskell, 4 Dess. 652, and Udall *v.* Kinney, 3 Cow. 590, are authorities to the same effect. Applying these authorities to the case before me, I am unable to see any thing in it that will justify me in disturbing the sale.

I shall accordingly direct the complainants' bill to be dismissed at their costs.