BENTON *v.* SHREEVE and Others.

To entitle a person to a specific performance of a sheriff's sale—if the sale can be at all enforced in equity—he must have filed his bill within a reasonable time, paid, or offered to pay, the purchase-money, and, in case of an offer, have followed up the tender by bringing the money into Court.

A junior mortgagee who, to protect his own interest, purchases the mortgaged premises at a sale upon foreclosure of the first mortgage, is entitled to be subrogated to all the rights and equities of the first mortgagee.

Gross inadequacy of price is not sufficient to set aside a judicial sale; but such inadequacy may be a controlling element, in connection with other circumstances, in determining its validity.

The opinion of the legislature, repeatedly expressed through the appraisement laws, is not without its uses to our own Courts, in aiding them to come to correct conclusions as to what shall be deemed adequacy or inadequacy of price.

A sheriff who, having several executions in his hands upon decrees of foreclosure against the same land, sells the land upon the execution having the preference, for a sum more than sufficient to satisfy it, should apply the surplus upon the other executions, according to the order of their preference.

The fact that the purchaser under the first execution has not fully paid the purchase-money, does not authorize the sheriff to sell upon the execution next having preference.   His act in accepting a part of the purchase-money, obliges him to take the proper steps to coerce payment of the residue.

ERROR to the *Wayne* Circuit Court.

STUART, J.—This was a bill in chancery·by the heirs, &c., of *Caleb Shreeve*, deceased, against *Benton* and others. *Benton* answered. The other defendants made default. The cause was set down for hearing on the bill, answer of *Benton*, depositions, &c., and there was a decree in favor of the complainants. *Benton* prosecutes this writ of error.

It appears that on the 27th of *May*, 1837, lot No. 60, in *Richmond*, owned by one *Forsha*, was mortgaged to *Joseph Derickson*, to secure the payment of 200 dollars, and interest at 10 per cent. On the 24th of *May*, 1838, *Forsha* sold and conveyed the lot to *Olds*. In *November* following *Olds* mortgaged the lot to one *Green*, to secure the payment of 200 dollars. And in *December*, 1838, *Olds* executed a second mortgage on the same lot to *Shreeve*, to secure another 200 dollars, with 10 per cent. interest. *Derickson* assigned his mortgage to *Sarah Derickson*, and *Keefer* became the remote assignee of *Green's* mortgage.

Both these latter mortgages were afterwards foreclosed. The *Derickson* decree was against *Forsha* and *Olds*, as defendants; the *Keefer* decree against *Olds* alone. *Shreeve*, the junior incumbrancer, was not made a party to either.

Executions were issued on the several decrees, and placed in the hands of the sheriff about the same time, though there is some confusion of dates. On the 30th of *January*, 1841, the lot was sold on the *Derickson* decree to *Caleb Shreeve* for 560 dollars. *Shreeve* paid 232 dollars and 60 cents on the *Derickson* execution, and failed to complete the further payment embraced in his bid. No deed was ever made or tendered by the sheriff, nor any further steps taken by him to compel *Shreeve* to pay. The sheriff returned the execution indorsed according to the facts. The *Derickson* decree was entered satisfied of record, with an express reference to the return of the sheriff as to the mode of payment.

On the same day, *January* 30, 1841, the sheriff sold the same lot on the *Keefer* decree to *Benton*, for 25 dollars. Deed by the sheriff to *Benton* accordingly.

Shortly after, *Caleb Shreeve* died, leaving the complain-

ants below his heirs, &c.  *Olds* is also dead, leaving the defendants of that name his heirs, &c.  *Keefer*, the assignee of the *Green* mortgage, was a party defendant. Thus all the parties having an interest in the subject matter were before the Court.

The answer of *Benton* puts nothing in issue material to the decision of this cause.

The bill contains four alternative prayers. One is for the specific performance of the sheriff's sale on the *Derickson* decree.  That such a sale may be enforced in equity, is not without authority; but in this state it has been doubted.  8 Blackf. 105.  Even if such sale could be enforced, the heirs of *Shreeve* are not in a position to seek it successfully.  Neither by their ancestor nor by them was the purchase completed.  To entitle a purchaser to such relief, he must have paid the money, or offered to pay it.  He must follow up the tender by bringing the money into Court.  Nor will specific performance be decreed where there has been unreasonable delay on the part of the purchaser.  4 Scam. 202.—4 J. C. R. 559. —4 Rand. 478.

Another of the alternative prayers was, that the *Shreeve* heirs be subrogated to the rights and remedies of *Sarah Derickson*.  That was, in substance, the decree; and it is correct, as far as it goes.  *Shreeve* had paid off that decree with the obvious purpose of protecting his own junior mortgage.  He was not a party to the foreclosure, and, perhaps, he was still entitled to redeem.  But it is sufficient that he had an interest to protect, and it is but fair to presume, what the whole transaction tends to show, that he acted with reference to the protection of that interest. He was, therefore, entitled to be subrogated.  2 Story 480.—7 Paige 248.—Leading E. C. 86-7.—*Peet* v. *Beers*, at the present term. (1)   The case of *Eddy* v. *Traver, et al.*, is a strong illustration of the leaning of the *American* courts in favor of the doctrine of subrogation.  6 Paige 521. (2)

Another of the alternative prayers of the bill is directed against the validity of *Benton's* purchase.  *Benton* had no

lien on the lot, no rights to protect. Nor is he a purchaser *without* notice; for he had constructive notice of the several mortgages. He had also constructive notice of all the facts returned by the sheriff as to the sale on the *Derickson* decree, and the payment of part of the purchase-money by *Shreeve*. Indeed, his answer, connected with other circumstances, goes far to establish actual knowledge. At the time *Benton* purchased for 25 dollars, most of the witnesses concur that the lot was worth 500 to 600 dollars; at the time of taking the depositions, 1,300 dollars; and that the rents and profits enjoyed by *Benton* were more than equal to the improvements he had made.

It thus appears that the price paid was about a twenty-fourth part of the value of the lot at the date of the purchase. On this ground, counsel contend that the sale to *Benton* was fraudulent and void, and rely on 1 Blackf. 410.—6 J. C. R. 411. But, on close examination, it will be seen that neither of these cases is in point. The ground on which those sales were set aside was, that the sheriff put up and sold at one time a large quantity of land, susceptible of division, and which should have been offered in suitable parcels. The amount due on the execution, and the price the land sold for, are thrown in by the Court in giving the history of the case, merely as supplemental. Here there is no pretence that the property could have been advantageously divided, but only that the price was inadequate.

As to what is inadequacy of price, the books are not agreed. Some authorities place the standard at one point, others at another. And in general, courts pay great regard to the circumstances and the equities involved in each case. Under the civil law, contracts for the sale of land were rescinded if the price was below half the value. 1 Story Eq. sec. 244, *et infra.* So it was in *France*, before the revolution. *Kent*, chancellor, in 2 J. C. R. 1. Perhaps a stranger, speaking of our appraisement laws, would refer them to the same class. At an early day, our statute placed the standard at one-half; later, at two-thirds,

&c. True, at the date of the *Keefer* mortgage, there was no appraisement law in force. Yet, in the consideration of doubtful cases, under judicial sales, the repeatedly expressed opinion of the legislature, as to what the standard should be in such sales, is not without its uses to our own courts in aiding them to come to correct conclusions as to adequacy or inadequacy of price.

In relation to different contracts, courts recognize different standards. Thus Chancery will often refuse to enforce specific performance of a contract, which, if executed, it would also refuse to set aside, leaving the parties to their legal remedies. 2 Story's Eq. 5.—11 Peters 229. —3 Cow. R. 445.—Sax. 320.—2 Blackf. 431. In *Seymour* v. *Delancy, Kent*, Chancellor, refused specific performance, adding, that the inadequacy of price was so great (one-half) as to give to the contract the character of hardship, unreasonableness and inequality. 6 J. C. R. 222.

In regard to the rescission of contracts on account of price, there is a general concurrence of authority in this rule, that mere inadequacy of price is not sufficient ground to set aside a sale, unless the inadequacy be so gross as to be of itself evidence of fraud. *Osgood* v. *Franklin*, 2 J. C. R. 1—affirmed by the Court of Errors on appeal. 14 J. R. 527. Thus, also, land estimated by the witnesses at from 3,000 dollars to 3,500 dollars, was sold for 2,900 dollars; held, that the inadequacy was not so gross as to indicate fraud. 1 Hoff. C. R. 37. So where land valued at 1,800 dollars, was sold at sheriff's sale for 400 dollars, it was held by this Court that the consideration could not be considered grossly inadequate. 2 Ind. 442. On the other hand, where a trustee sold and conveyed the trust lands worth 500 dollars, for 50 dollars, (one-tenth the value) the sale was set aside as fraudulent.

In view of these authorities, it is easy to conclude that the price paid by *Benton* was grossly inadequate.

But the authorities indicate a further distinction between private and public sales.

The rule that a sale will be set aside for gross inadequacy of price applies only to private sales, and not to

sales at public auction.  1 Freem. 441.  So in *Livingston v. Byrne*, the Court of Errors held unanimously that inadequacy of price was not sufficient to invalidate a judicial sale, unless there be additional circumstances to justify it.  And that decision is placed on the authority of Lord *Elden*, in *White v. Damon*, 7 Ves. Jr. 34.  See, also, accordingly, 3 Hay.—1 Spears's Ch. 351.—2 Green's Ch. 460.

The rule to be deduced from these authorities, as applicable to this case, is, that gross inadequacy of price is not sufficient, of itself, to set aside a judicial sale like that to *Benton;* but that such inadequacy may be a controlling element, in connection with other circumstances.  The reason given in the books for this distinction between public and private sales, is, by no means, satisfactory.  At first thought, the stringency should be the other way.  It would seem, however, to have been recognized as the law, by this Court, in a very strong case, which, under all the circumstances, presses the doctrine to its utmost tension.  *Roe v. Ross*, 2 Ind. 99.  In that case, the sheriff sold a house and lot worth 1,200 to 1,500 dollars, for 111 dollars, and the Court held, that in the absence of fraud, the price was not inadequate.

It only remains to inquire whether the case under consideration furnishes any of the " additional circumstances" contemplated by the authorities.  We think it does.  The number of parties having equitable liens on the lot, is a circumstance of no inconsiderable weight.  In most of the authorities cited, the question arose, as in *Roe v. Ross*, supra, directly between the execution-defendant and the purchaser in an action at law.  Such is the position, in part, of the heirs of *Olds*, in this case, to *Benton*.  They reaped the benefit of all the mortgages.  Theirs was the fault that these mortgages were not paid off without legal process.  If they stood alone, the heirs of *Olds* would present a feebler claim to equitable relief.  Not so with the other parties.  They advanced their money.  They took this lot as the security.  It was ample, or nearly so, for the purpose.  With great force and justice do they appeal

to the equity of the courts not to suffer them to be defrauded under the forms of legal process.

There is another circumstance, of a very conclusive character. The sale of the lot on the *Derickson* decree, placed at the disposal of the sheriff more than sufficient to pay both mortgages. The sum (560 dollars) was in contemplation of law, in the hands of the officer for the very purpose of paying both. If *Shreeve* refused to complete the purchase, the law pointed out to the sheriff several modes of procedure. His act in accepting part of the purchase-money, committed him to one course—to take the proper steps to coerce payment, and apply the balance of the bid on the *Keefer* decree. To sell on the junior decree, after he had sold on the senior for sufficient to pay both, was useless trifling. There was nothing further which the sheriff had a right to sell on the *Keefer* decree, or that *Benton* could purchase.

Here, then, was property encumbered by three mortgages, of sufficient value to pay nearly all of them, already sold on a senior mortgage, resold on a junior mortgage, for a trifle, and to one having no interest in the lot, leaving the creditors unpaid, the security exhausted, and the mortgagor still liable for the debts as the law then stood. To support such a sale, a Court of equity should require very strong authority, directly in point, and based upon very strong reasons of public policy.

We therefore conclude that the second sale was, under all the circumstances, a gross abuse of his power on the part of the officer—a fraud on *Keefer*, and on all the parties interested. Connecting the acts of the officer with the position and knowledge of *Benton*, the transaction was clearly fraudulent, and must be declared void. 5 Blackf. 260.

The evidence fully sustains the decision of the Court below, that the rents and profits enjoyed by *Benton* were an equivalent for the improvements he had made. A strict adherence to the authorities would deprive *Benton* of the interest on the 25 dollars purchase-money. 1 Dana

56.—2 *id.* 374.—4 *id.* 507.—5 *id.* 119. But there are also numerous authorities the other way. With the rescission of the contract, and the refunding of the purchase-money, it seems the vendee (*Benton*) should be required to deliver possession of the premises. 4 Ham. 229.

The case is now in a position to enable the Court below to administer equitable relief to all the parties. The *Shreeve* heirs represent the first and third mortgages, *Keefer* and *Benton* the second mortgage, and the heirs of *Olds* the equity of redemption. The latter should be allowed a reasonable time, say sixty days, to discharge the incumbrances; in default thereof, the lot should be sold and the liens paid in the order of their priority.

*Per Curiam.*—The decree is reversed—the parties, plaintiff and defendants, to pay their own costs. Cause remanded with instructions to the Circuit Court to enter a decree in accordance with the principles above indicated.

*C. H. Test,* for the plaintiff.

*J. Perry,* for the defendants.

(1) *Ante,* p. 46.

(2) In *Eddy* v. *Traver*, cited in the text, the facts were these: *G. Eddy*, the ancestor, died intestate in 1828, leaving four children, of whom *Sally*, the wife of *Traver*, was one. In *April*, 1829, *Traver* and wife conveyed with warranty to *Ross*, their undivided one-fourth of a parcel of the real estate of which the intestate died seized, leaving their undivided interest in the premises of which partition was sought in this case, undisposed of. The personal estate of the intestate being found insufficient to pay the debts, the personal representative obtained an order to sell a part of the lands conveyed by *Traver* and wife to *Ross*; and the proceeds thereof were applied to the payment of the intestate's debts. As *Traver* and wife still owned their undivided one-fourth of the premises, which were subsequently decreed to be sold in the partition suit, *Ross* claimed to have an equitable lien on their undivided interest therein, to remunerate him for his one-fourth of the lands sold as aforesaid, the proceeds of which were applied to debts for the payment of which *Traver* and wife were liable on account of the lands descended to the wife. *Ross* also claimed interest from the time he was divested by the sale. On this state of facts, the chancellor held that *Ross* had an equitable lien upon the residue of the lands remaining in the hands of *Traver* and wife, to the extent of his share of the proceeds of the land sold by the order of the surrogate. And he lays it down as an established principle of equity, that a surety, or one who stands like *Ross*, in the situation of a surety, is entitled to be subrogated to all the rights and remedies of the creditor whose debt he is compelled to pay,

as to any fund, lien, or equity which the creditor had against any other person or property on account of such debt. In the course of his opinion, the chancellor cites *Watts* v. *Kinney*, 3 Leigh's R. 272, where the sureties had actually paid the debt, so that the lien of the creditor's judgment was discharged at law; yet the Court decided that the sureties were in equity entitled to the benefit of the judgment, as a lien on the land, against the claims of an attaching creditor.